* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pretrial Agreement dated January 3, 2003, as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the Commission has jurisdiction over the parties and the subject matter.
3. It is stipulated that all parties have been correctly designated and there is no question as to misjoinder or non-joinder of parties.
4. An employer-employee relationship existed between plaintiff and defendant-employer on June 13, 2003.
5. That on the date of the incident in question, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
6. That the carrier on the risk was Liberty Mutual Insurance Company.
7. That the plaintiff earned an average weekly wage of $1,016.69 which is sufficient to yield the maximum compensation rate for the year 2003 of $674.00.
 * * * * * * * * * * *
Based upon all the evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. This claim involves a work incident which occurred on June 13, 2003, as a result of which plaintiff claims he suffered several injuries, including injuries to his neck, upper back and left lower extremity as well as headaches and vertigo.
2. At the time of the hearing before the Deputy Commissioner plaintiff was a fifty-one year old male with a high school education.
3. Plaintiff started working for defendant-employer in July, 1979. For the six year period prior to the work incident in question, plaintiff worked as a tuber assistant for defendant-employer. This duties of this job included entering a code governing tread length and tread width into a computer and following through to insure that the correct code had been entered for a particular production run of tires.
4. In 1997 plaintiff was involved in a motor vehicle accident in which he rear-ended a parked car. Plaintiff sustained injuries to his neck and back for which he treated with a chiropractor.
5. On June 12, 2003, the day before the work incident in question, plaintiff presented to a chiropractor, Dr. Ali Ergun, with complaints of left-sided neck pain of eight weeks duration. Plaintiff reported a gradual onset of symptoms that had progressively worsened during this eight week period to the point that they began interfering with his daily routine and activities. Plaintiff also reported having been involved in an automobile accident approximately 6 years earlier in which he sustained injuries to his neck. Dr. Ergun noted this to be the "mechanism of injury" in his physical examination record. Although plaintiff denied having experienced any neck-related symptoms other than "stiffness" prior to the work incident in question at hearing, he completed a health questionnaire on which he indicated that he was then experiencing or had experienced within the previous year the following symptoms: (1) neck stiffness; (2) neck pain; (3) grinding/popping sensations in the neck; and (4) neck feels out of place. After an examination, Dr. Ergun diagnosed plaintiff with cervical anterior dysfunction with related muscular spasms and pain, wrote him out of work for that day and released him with instructions to return should his symptoms persist.
6. Plaintiff returned to work on June 13, 2003. At approximately 7:40 a.m., while facing a computer console and keying in codes, plaintiff found himself positioned between the console before him and a "tread trap" behind him. The tread trap is a four-wheeled machine, about eight feet long and five feet tall and about a foot off the floor. When the tread trap was pulled off by a coworker, it brushed up against plaintiff's left leg, momentarily trapping him against the computer console so that he could not move. Plaintiff maintained his balance and walked away from the console once the tread trap had pulled away.
7. Although plaintiff claimed at hearing that the tread knocked his legs out from under him, causing him to fall backwards to the cement floor and forcing him to catch himself with his outstretched left arm, a coworker, John Lewis, witnessed the incident and testified that plaintiff was not knocked to the ground nor forced to catch himself in any way. Mr. Lewis also testified that plaintiff was merely trapped between the computer console and tread trap momentarily so that he could not move. The undersigned finds Mr. Lewis' testimony wholly credible.
8. There was no evidence presented to indicate that plaintiff was struck anywhere other than the left leg by the tread trap or that the incident caused any kind of flexion or torsion of plaintiff's neck and/or cervical spine.
9. Plaintiff reported the incident to his manager, Al Phillips, who gave him a pass to the plant dispensary. Lana Vanstory, a physician's assistant in the plant dispensary, examined plaintiff within minutes of the incident. Plaintiff informed her that he had seen a chiropractor the day before for neck pain. Ms. Vanstory examined plaintiff's cervical spine and found plaintiff to have full range of motion. She examined plaintiff's left leg and failed to find any evidence of any kind of direct trauma to the leg. Ms. Vanstory's examination revealed only tenderness between the neck and shoulder on his left side. Vanstory recommended anti-inflammatories and ice, but plaintiff insisted that x-rays of his neck be ordered. X-rays of plaintiff's cervical spine obtained on June 13, 2003 revealed multilevel degenerative arthritic changes involving C3 through T1 with degenerative disc disease C3-C4 through C6-C7 but no evidence of significant bony encroachment upon the vertebral foramina. Ms. Vanstory subsequently released plaintiff to return to regular duty work with no restrictions.
10. Plaintiff's area manager, Al Phillips, investigated the incident in question, speaking with plaintiff after he returned from the dispensary. Plaintiff told Mr. Phillips that the tread trap "just brushed him slightly on the left leg" and did not report that the tread trap had knocked his legs out from under him or caused him to fall backwards. The testimony of both Mr. Lewis and Mr. Phillips testimony is corroborated by the accident investigation report completed by Mr. Phillips which indicates that the tread trap "turned slightly, striking associate on his left leg." Plaintiff also told Mr. Phillips that he had seen a chiropractor the day before for "pain in his left neck and left side" and attributed these symptoms to an automobile accident from four to five years earlier.
11. Plaintiff was scheduled to work the day following the incident, which was Saturday, June 14, 2003. He went in as scheduled and worked for four hours before calling a co-worker to relieve him.
12. Plaintiff returned to Dr. Ergun on Monday, June 16, 2003, with complaints of "neck and low back pain on the left side." Plaintiff complained of the same cervical symptoms to Dr. Ergun on this date as he had the day before the incident in question. Dr. Ergun released plaintiff to return to work without restriction, effective June 17, 2003.
13. On Saturday, June 21, 2003, plaintiff presented to Hope Mills Urgent Care, where he was seen and evaluated by nurse practitioner, Maria Kinney. Plaintiff's history was taken, and he was diagnosed with neck and lower back pain, given a trigger point injection at the base of his neck, advised to continue physical therapy for two weeks, and written out of work for two weeks. The history that plaintiff gave Maria Kinney included reference to the incident with the tread trap on June 13, 2003, specifically that he was hit on the lower left leg by the tread trap. There was no indication in the history given by plaintiff that he had fallen on his buttocks, no indication that he was struck anywhere other than the left lower leg, no indication that he was struck in the head, neck or shoulder area, no indication that his neck was jerked or jarred by the impact, no indication that he had experienced or was experiencing headaches or vertigo, no indication that he had been involved in a motor vehicle accident years before for which he had treated with a chiropractor, and no indication that he had seen a chiropractor as recently as the day before the incident for complaints of neck pain of some eight weeks duration.
14. Plaintiff returned to Hope Mills Urgent Care on Monday, June 23, 2003, at which time he was first seen by Dr. Toby Okons. Plaintiff returned to Hope Mills Urgent Care some fourteen times over the next three weeks for therapy and follow-up with Dr. Okons. On July 14, 2003, Dr. Okons released plaintiff to return to work light duty, effective July 15, 2003. Not once during this period of treatment with Dr. Okons did plaintiff complain of any cervical radicular symptoms into the upper extremities.
15. On July 16, 2003, plaintiff presented to Dr. Douglas Norris at Cumberland Chiropractic Center upon a referral from Dr. Ergun. Plaintiff complained of head and neck pain which occurred when his left leg was knocked out from under while at work, causing him to catch himself on his left arm. Plaintiff did not report his symptoms or treatment with Dr. Ergun just prior to the work incident in question or his sustaining similar injuries in an automobile accident 4 to 6 years earlier. Dr. Norris diagnosed plaintiff with multiple cervical conditions and recommended conservative treatment. Plaintiff's treatment at Cumberland Chiropractic included twenty-eight visits over the course of approximately three months and consisted of various chiropractic modalities, including manipulation, traction and stimulation.
16. Only once during his treatment with Dr. Norris did plaintiff complain of any radicular symptoms into his upper extremities. This occurred on September 8, 2003 (almost three months after the work incident in question) when plaintiff complained of feeling a shooting pain down into his right arm during a church service. Plaintiff never again complained of this or other radicular symptoms into his upper extremities while treating at Cumberland Chiropractic.
17. Plaintiff returned to Dr. Okons on August 4, 2003, at which time Dr. Okons ordered an MRI of plaintiff's cervical spine. The MRI was performed on August 7, 2003 and revealed cervical degenerative disc disease, advanced cervical spondylosis with degenerative spinal stenosis at C3-4 through C6-7, and a small disc protrusion at the C3-4 level. Dr. Okons testified that these findings were degenerative in nature. After having been made aware of plaintiff's symptoms and treatment with Dr. Ergun prior to the work incident in question, Dr. Okons testified that plaintiff's cervical symptoms were progressively worsening on their own before the work incident in question. After reviewing these findings on August 18, 2003, Dr. Okons referred plaintiff for neurosurgical evaluation.
18. After this referral, plaintiff continued to treat with Dr. Okons for his neck pain through at least December 4, 2003. As earlier, plaintiff did not complain of any radicular symptoms into his upper extremities while he continued to treat with Dr. Okons. (Stip. Ex. 2, pp. 35-43).
19. Plaintiff presented to Dr. Muhammed Khasru, a neurologist, on October 8, 2003 for evaluation of his neck pain. Dr. Khasru indicated in his office note and confirmed in his deposition that plaintiff's neck pain did not radiate into his upper extremities below the shoulder. Dr. Khasru also indicated in his deposition that, except for a one-time complaint of "hand drawing" which may or may not have been a true radicular symptom, plaintiff did not report or exhibit any other cervical radicular symptoms while treating with him.
20. At his initial visit with Dr. Khasru, plaintiff related his neck pain to the work incident in question, stating that the tread trap had knocked his legs out from under him causing him to fall on the cement floor. Plaintiff also reported feeling an immediate pop and burning sensation in his neck, a history he had not given to any of his other previous medical providers. As with Dr. Okons and Dr. Norris, plaintiff did not inform Dr. Khasru of his cervical symptoms and treatment with Dr. Ergun prior to the work incident in question, nor did plaintiff inform Dr. Khasru of his prior automobile accident either.
21. Dr. Khasru performed a physical examination of plaintiff which revealed that he had pain in the left side of the neck and shoulder, but no restriction of neck movement or shoulder movement. Dr. Khasru diagnosed cervical spondylosis, or "multiple level arthritis" of the cervical joints, myofascial pain, and possible radiculopathy of the C6 on the left. His recommendations for further treatment included referral to physical therapy for head and neck massage, TENS therapy, a functional capacity evaluation, and a nerve conduction velocity study and EMG of the upper extremities. Dr. Khasru also wrote plaintiff out of work for two weeks, pending the results of a functional capacity evaluation, with the understanding that the evaluation would be scheduled and conducted accordingly.
22. The functional capacity evaluation was not completed until January 6, 2004. The summary from that functional capacity evaluation noted minimal complaints of pain overall. The FCE indicated that plaintiff's could lift up to 40 pounds on a regular basis and 75 pounds on an infrequent basis. The FCE indicated that plaintiff could return to work within these guidelines along with avoidance of prolonged overhead reaching.
23. Plaintiff presented to Dr. Kishbaugh per Dr. Khasru's referral on February 23, 2004. Dr. Kishbaugh took plaintiff's history which included reference to the incident at work on June 13, 2003, but made no reference to plaintiff's complaints of left-sided neck pain prior to the incident of June 13, 2003. Dr. Kishbaugh noted that plaintiff had not returned to work, that he had treated conservatively, that he had discontinued all medications except Skelaxin and Bextra, and that he was having no radicular symptoms in his upper or lower extremities. Dr. Kishbaugh diagnosed cervical spondylosis and myofascial pain, recommended daily stretching and strengthening exercises, and released plaintiff to return to work without restriction.
24. Plaintiff returned to work on March 4, 2004. He initially returned in a light duty capacity but, after two weeks returned to his regular duty job as a tuber assistant. Plaintiff continued working in this capacity for defendant-employer until May 18, 2004, at which time he was written out of work by Dr. Khasru for vertigo symptoms which were not related to the work incident in question.
25. Plaintiff continued to treat with Dr. Khasru after his return to work at Goodyear. During this time, plaintiff did not report or complain of any radicular pain or other symptoms into his upper extremities.
26. On June 24, 2004, plaintiff was seen and evaluated by Dr. Dennis Bullard, a neurosurgeon for evaluation of neck and left upper extremity pain. This was the first time that plaintiff had complained of any ongoing symptoms into his left upper extremity. Plaintiff related his symptoms to being "knocked down by a tread trap, weighing approximately 6000 pounds, at work on 6/13/04." As with his prior physicians, plaintiff did not report his symptoms or treatment with Dr. Ergun just prior to the work incident in question or his prior automobile accident 4 to 6 years earlier. After an examination and review of reports of plaintiff's prior diagnostic studies, Dr. Bullard diagnosed plaintiff with a reversal of the normal cervical lordosis, with significant kyphosis.
27. Dr. Bullard also ordered electrodiagnostic studies which were performed on July 26, 2004 and returned slightly abnormal with slight reinnervation change noted in the left arm. The clinical significance of this finding was noted to be "uncertain". The studies revealed no definite electrophysiologic evidence of an active left radiculopathy from C5-T1.
28. Plaintiff continued to treat with Dr. Bullard for the same symptoms through at least January 20, 2005. Dr. Bullard has recommended cervical fusion surgery for plaintiff, but he has not undergone this surgery to date.
29. Even when asked to assume the facts most favorable to plaintiff regarding how the work incident occurred, Dr. Okons and Dr. Khasru would only testify that the incident "possibly" aggravated or exacerbated plaintiff's condition. Neither testified that the incident in question more likely than not caused plaintiff's condition or materially aggravated plaintiff's pre-existing cervical condition.
30. While Dr. Bullard did offer an opinion linking plaintiff's condition with the accident of June 13, 2003, he based his opinion on the presence of symptoms about which plaintiff complained only once over the course of a year following the incident, and on a hypothetical that painted a much more dramatic picture of the incident than is supported by the evidence. Specifically, Dr. Bullard's opinion assumed that plaintiff either suffered a direct trauma to the neck and/or upper back or that he suffered some sort of flexion and/or torsion injury as a result of the incident. Neither of these mechanisms of injury are supported by the competent, credible evidence of record. Accordingly, Dr. Bullard's testimony in this regard is given little, if any, weight.
31. When asked to reconsider his causation opinion based on a hypothetical that was supported by the competent, credible evidence of record and found as facts herein, Dr. Bullard admitted that he could not testify to any reasonable degree of certainty that plaintiff's condition was, more likely than not, exacerbated or aggravated by his work incident on June 13, 2003. Thus, Dr. Bullard could not provide plaintiff with the necessary causation opinion.
32. Defendants produced competent and credible evidence that plaintiff's pre-existing cervical condition was not permanently and materially aggravated by the work incident in question. Dr. James Fulghum, who is a board certified neurosurgeon, identified plaintiff's conditions as cervical spondylosis and kyphosis and noted that these conditions were most often congenital in nature, resulting from a more general and gradual process of deterioration. When presented with hypothetical question supported by the competent, credible evidence of record and found as facts herein Dr. Fulghum opined that the work incident in question did not cause or permanently and materially aggravate plaintiff's cervical conditions. In fact, Dr. Fulghum testified that given plaintiff's pre-existing condition, his symptoms and treatment prior to the incident in question, and the significant delay in the development of any true radicular symptoms after the incident in question, plaintiff's condition and disability, if any, were consistent with and most likely related to a natural and progressive worsening of his pre-existing cervical condition without any contribution from the work incident of June 13, 2003. The undersigned specifically finds Dr. Fulghum's testimony credible and convincing on the issue of causation.
33. Plaintiff produced insufficient evidence to prove that any of his claimed conditions were caused or materially aggravated by the incident in question.
 * * * * * * * * * * *
Based on the foregoing Findings of Fact the Full Commission makes the following additional
 CONCLUSIONS OF LAW
1. An injury is compensable under the Workers' Compensation Act only if the "injury" is (1) by accident, (2) "arising out of" the employment, and (3) "in the course of" the employment. Plaintiff failed to prove that he sustained an injury by accident or specific traumatic incident arising out of and in the course and scope of his employment with defendant-employer on June 13, 2003. N.C. Gen. Stat. § 97-2(6).
2. "For an injury to be compensable under the terms of the North Carolina Workmen's Compensation Act, it must be proximately caused by an accident arising out of and suffered in the course of employment."Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980). Plaintiff failed to satisfy his burden of proving that the accident/incident in question caused his claimed injuries or conditions or materially aggravated his claimed injuries or conditions. N.C. Gen. Stat. § 97-2(6); Bryan v. First Free Will Baptist Church, 267 N.C. 111,115, 147 S.E.2d 633, 635 (1966); Wall by Wall v. North Hills Properties,Inc., 125 N.C. App. 357, 481 S.E.2d 303, rev. denied, 346 N.C. 289,487 S.E.2d 573 (1997); Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750
(2003); and Poole v. Tammy Lynn Center, 151 N.C. App. 668,566 S.E.2d 839 (2002).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Since plaintiff did not carry his burden that any of his claimed conditions were causally related to the work incident of June 13, 2003, his claim for workers' compensation benefits is and must be hereby DENIED.
2. Each party shall bear their own costs.
This the 31st day of August 2006.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE CHAIRMAN
DISSENTING WITHOUT WRITTEN OPINION:
 S/___________________ THOMAS J. BOLCH COMMISSIONER